UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMETRIUS BRADY,

                Plaintiff,                      Case No. 08-13463

v.                                        Hon. Nancy G. Edmunds

DAVID STONE and JOHN JOHNSON,

                Defendant.

_____/

**OPINION AND ORDER: (1) GRANTING DEFENDANTS' AMENDED
MOTION FOR SUMMARY JUDGMENT [47, 49]; (2) GRANTING
DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CASE NO. 10-
12088 [57]; (3) DENYING PLAINTIFF'S MOTION TO EXTEND THE
SCHEDULING ORDER [60]; AND (4) DENYING AS MOOT PLAINTIFF'S
MOTION IN LIMINE [59]**

Plaintiff Demetrius Brady filed this action alleging that—in executing his arrest—the
City of Pontiac and police officers David Stone and John Johnson used excessive force
violating his constitutional rights as secured by the Fourth and Fourteenth Amendments
and seeks damages under 42 U.S.C. § 1983. This matter comes before the Court on
Defendants' motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56.
For the reasons set forth below, Defendants' amended motion for summary judgment is
GRANTED.

**I.    Facts**

    **A.  Unarmed Robbery**

On April 7, 2007, Plaintiff and his friend, Antoine Smith, were at Great Lakes Crossing
Mall in Auburn Hills, Michigan. (Brady Dep., Defs.' Mot., Ex. A at 82.) Plaintiff observed

another mall patron, Simir Kadi, seated in the food court working on a laptop computer. (*Id.* at 85.) Plaintiff decided to steal Kadi's laptop and concocted a plan to do just that. (*Id.* at 83, 85.) Plaintiff encouraged Smith to strike Kadi on the head with his fist, thereby creating a diversion, while Plaintiff stole the laptop. (*Id.* at 85.) Smith complied—he walked up to Kadi from behind and "cold cock[ed] him in the head." Plaintiff grabbed the laptop and both Plaintiff and Smith ran out of the mall. (*Id.*) Once outside, Plaintiff and Smith fled to Smith's vehicle and Smith drove them out of the mall parking lot and onto Baldwin Road. (Auburn Hills Police Department Follow-up Report, Defs.' Mot., Ex. B.)

### B. Flight

A number of other mall patrons witnessed the robbery and called 911. Two of the mall patrons actually followed Plaintiff and Smith out of the mall parking lot in their vehicles, a red pick-up truck and a black Durango. Auburn Hills police officer Jeff Walker, who was in the parking lot of the mall at the time of the robbery, was the first officer to respond.

> A citizen had followed the suspect into the parking lot of American House Retirement Housing. ... Upon reaching the entrance to American House ... the red pick up truck ... rolled down his window and stated that he was on the phone with dispatch and that he was the witness that was following the suspect vehicle. Seconds later [Plaintiff and Smith's car] ... exited the American House lot. There was a black Durango directly behind the[m] ... It appeared that [Plaintiff and Smith were] ... trying to get away from the Durango that was continuously beeping its' [sic] horn as it followed the[m].

(Auburn Hills Police Department Follow-up Report, Defs.' Mot., Ex. B.) Officer Walker began to pursue Plaintiff and Smith who were "traveling quickly and w[ere] not stopping for stop signs." (*Id.*) A high speed chase ensued. (Brady Dep., Defs.' Mot., Ex. A at 92-93.)

Officer Walker activated his lights and siren in an attempt to catch up to Plaintiff and Smith's vehicle. At an intersection in the City of Pontiac, Plaintiff and Smith ran a stop sign

and collided with a passing vehicle. (*Id.*) Both vehicles spun out of control and landed off the roadway. (Brady Dep., Defs.' Mot., Ex. A at 90.) The violent collision—where the other vehicle "went airborne across the intersection"—was captured on Officer Walker's in-car video. (Walters Statement, Defs.' Mot., Ex. L at 1; Defs.' Mot., Ex. C; Brady Dep., Defs.' Mot., Ex. A at 94.)

Both Plaintiff and Smith exited their vehicle and proceeded to flee on foot. (Auburn Hills Police Department Follow-up Report, Defs.' Mot., Ex. B; Brady Dep., Defs.' Mot., Ex. A at 91.) Officer Walker pulled up next to Plaintiff and Smith in his patrol car and ordered them to stop. They refused to obey the command and, instead, continued to flee on foot. Officer Walker then exited his patrol car and chased Plaintiff and Smith. Officer Walker unholstered his firearm and, again, ordered Plaintiff and Smith to stop. Smith complied and laid face first on the ground. Plaintiff, on the other hand, continued to flee and headed towards some nearby train tracks. (*Id.*; Brady Dep., Defs.' Mot., Ex. A at 91, 93, 97; Am. Compl. ¶ 9.) Plaintiff crossed the train tracks, jumped a fence, and cut across a couple of streets into a nearby residential neighborhood. (Brady Dep., Defs.' Mot., Ex. A at 99.)

### C. Civilian Arrest

The black Durango, that had initially followed Plaintiff and Smith out of the mall parking lot onto Baldwin Road—along with other civilians who had witnessed the crash—continued to pursue Plaintiff while Officer Walker took Smith into custody. (Auburn Hills Police Department Follow-up Report, Defs.' Mot., Ex. B.) A few blocks away from the crash scene, a group of civilians confronted Plaintiff and were able to subdue Plaintiff by forcing him to the ground with his hands behind his back. (*See* Williams Statement, Defs.' Mot., Ex. L at 8; Sullivan Statement, Defs.' Mot., Ex. L at 1; Am. Compl. ¶ 10.) Anthony

Williams, one of the witnesses to the car accident, and John Garten, a neighbor, attempted to detain Plaintiff. (Williams Statement, Defs.' Mot., Ex. L at 8; Sullivan Statement, Defs.' Mot., Ex. L at 1; Brady Dep., Defs.' Mot., Ex. A at 99-101.)

Plaintiff initially struggled with the citizens and protested his innocence. (Williams Statement, Defs.' Mot., Ex. L at 8; *see also* Sullivan Statement, Defs.' Mot., Ex. L at 1, 4 ("[Williams and Garten] both grab[bed] [Plaintiff], put him down on the ground because he keeps trying to get away. ... He was screaming and pulling up his hand. ... Yeah he was trying to get up the whole time.").) Williams, in an interview with the Pontiac Police Department (PPD), stated that "I just wrassled him down to the ground and held him there." And, for a minute or so, Plaintiff was struggling with him and trying to fight back. (Williams Statement, Defs.' Mot., Ex. L at 8; *see also* John Garten Statement, Defs.' Mot., Ex. L at 6 ("Yeah he [was trying to break away] ... He did move one hand up but he couldn't. I was ... just holding him there you know.").) Plaintiff eventually discontinued any attempt to resist the citizens and surrendered to them. (Brady Dep., Defs.' Mot., Ex. A at 99-101.) The civilians held Plaintiff there until the police arrived. (Am. Compl. ¶ 11.)

### D. Police Custody

Shortly thereafter Officers Stone and Johnson, from the PPD, arrived to relieve the citizens. Officers Stone and Johnson proceeded to take Plaintiff into custody. (Am. Compl. ¶ 12; Brady Dep., Defs.' Mot., Ex. A at 105-06; *see also* Stone Aff., Defs.' Mot., Ex. M ¶ 10 ("As I and my partner approached [Plaintiff], the citizens separated and released their grip. I and Officer Johnson pulled [Plaintiff] to his feet and began to walk him toward our police vehicle. It was my intention to place [Plaintiff] on the police vehicle, pat him down for weapons and secure him in handcuffs.").)

En route to the patrol car, Plaintiff resisted the officers' attempt to arrest him: "[h]e pulled back, dragged his feet, and [continued to] protest[] his innocence." (Stone Aff., Defs.' Mot., Ex. M ¶ 11; Brady Dep., Defs.' Mot., Ex. A at 106-07.) Deanna Kaller, a civilian who witnessed the crash, also observed Plaintiff struggling with the officers. (Kaller Statement, Defs.' Mot., Ex. L at 1, 5 ("... he wasn't walking to where he wanted to go. He was trying to get out ... struggling with his arms."); *see also id.* at 7 ("He was pretty much fighting, struggling you know. ... He really was persistent on not wanting to go and claiming he didn't do it.").) Williams, in that same interview, similarly stated that "the officers ... they were struggling with [Plaintiff]." (Williams Statement, Defs.' Mot., Ex. L at 10); *see also id.* at 11 ("... he was still squirming and all that. Yeah. All the way from when they picked him up from the ground, all the way to the car, even when they was trying to put him in the backseat he was still struggling with then [sic]. ... Well he was trying to ... resist them so they had to push him down. ... He ... was leaning back and then he was standing swerming [sic].").) In his interview with the PPD, Rick Sullivan—who was approximately 20 feet away and had a "pretty good" view—stated that Plaintiff was resisting the officers' attempt to detain him and would not comply with the officers' commands. (Sullivan Statement, Defs.' Mot., Ex. L at 8-9; *see also id.* at 4 ("[Plaintiff had] been resisting the whole time. ... He's pulling and hollering the whole time.").)

Once at the patrol car, Officer Johnson stepped aside to conduct some other activities while Officer Stone proceeded to place Plaintiff on the hood in order to pat him down and cuff him. (Am. Compl. ¶ 15; Brady Dep., Defs.' Mot., Ex. A at 111, 113.) Plaintiff continued to resist Officer Stone's efforts to take custody of him. (Sullivan Statement, Defs.' Mot., Ex. L at 5-6 ("[The officers] had the back of his head and pushed him down on the car and he's

still jerking around and pulling and junk. ... I got to believe [Plaintiff] was trying to resist the whole time he freaking jerking away ... the whole time. ... I seen him drag him over to the car. I know he was resisting them. ... He's walking over to the car, resisting the whole time. ... He's not trying to walk over there with them, he's pulling and hollering and saying the whole time he's hollering he didn't do nothing."); *see also id.* at 6-7 (responding to the question "Did you see him actively resisting the officers before they put him over the hood of the car?", Sullivan stated "Yes I did. He was resisting the whole time. He was trying to run away. Even when the officers had a hold of him he was trying to get away. ... Jerking his arms and trying to pull away from the officers.").) Plaintiff—in acknowledging a factual basis for his plea of guilty to resisting, obstructing, and assaulting a police officer—testified that he "was leaning back towards the officers" and contacted them with his body when he knew that the officers were tying to arrest him. (Tr. Plea Hr'g, Defs.' Mot., Ex. F at 5.)

While attempting to bring Plaintiff under control, Officer Stone testified that Plaintiff "pulled backwards and away" from him again, causing Officer Stone to lose his grip. (Stone Aff., Defs.' Mot., Ex. M ¶ 12; *see also* Sullivan Statement, Defs.' Mot., Ex. L at 6 (responding to the question "Now once they get him right up to the fender of that car though did you see him at any time rear back or try to pull his arms free from the officers?", Sullivan stated "He was trying to pull his self up off the hood of the car every time."); *id.* at 7 ("Well I seen [the officer] push [Plaintiff] down on the car a couple of times trying to jerk [Plaintiff's] hands back so [the police] could handcuff him."); *id.* (responding to the question "Now each time ... he was being pushed down, was he r[e]aring back up pushing himself off the hood of the car?", Sullivan stated "Yeah he was trying to lift his self back up.").) Officer Stone "regripped and pushed [Plaintiff] forward onto the hood of the police vehicle.

In the process [Plaintiff's] head or shoulder struck the windshield of the police car." (Stone Aff., Defs.' Mot., Ex. M ¶¶ 12, 15; *see also* Am. Compl. ¶ 16.) The windshield was damaged and, according to Plaintiff, his tooth[1] was injured as a result of hitting the windshield.[2] (Am. Compl. ¶¶ 17-18.)

Plaintiff alleges that after he struck the windshield, Officer Stone lifted up Plaintiff's face and "repeatedly socked [him] in the jaw." (Brady Dep., Defs.' Mot., Ex. A at 121-25.) Even though Plaintiff testified that the citizens were "right there" and that Office Stone socked him "out in the open in front of everyone," none of the witnesses saw Officer Stone do anything of the kind.[3] (*Id.* at 125.) Plaintiff also alleges that Officer Stone, after socking him, "proceeded to walk [him] around to the driver's side of the [patrol car] ... but before [they] got to th[at] side of the car, he stopped me directly in the middle of the street and repeatedly socked me again." (*Id.* at 127.) Again, this occurred right in front of everybody, but no other witness noticed this. (*Id.* at 130-31.)

Officer Stone then placed Plaintiff in the patrol car. (*Id.* at 132; Stone Aff., Defs.' Mot., Ex. M ¶13.) According to Plaintiff, Officer Stone walked away and returned "in the spurt of a snap of a finger" to inflict yet another beating. (Brady Dep., Defs.' Mot., Ex. A at 132-33

---

[1] A piece of Plaintiff's tooth was later observed on the windshield of the patrol car. (*See* Harris Dep., Pl.'s Resp., Ex. 5 at 10-11.)

[2] Plaintiff claims that Officer Stone grabbed him by his hair and slammed his head through the windshield. (Brady Dep., Defs.' Mot., Ex. A at 117-21.) The in-car video shows Plaintiff's head moving toward the windshield and Officer Stone's open hand in the vicinity of Plaintiff's head. (*See* Pl.'s Resp., Ex. 3.) None of the witnesses to the incident saw Officer Stone grab Plaintiff by his hair and slam Plaintiff's head through the windshield.

[3] Kaller stated in her interview that she never saw a police officer punch or hit Plaintiff. (Kaller Statement, Defs.' Mot., Ex. L at 7.) Williams similarly stated that he never saw the officers strike Plaintiff. (Williams Statement, Defs.' Mot., Ex. L at 10.)

("[Officer Stone] bashes my head against the plastic piece inside of the car ... He takes the palm of his hand and bashes my head into the plastic piece.").) (*See also* Am. Compl. ¶ 21.) Other witnesses, including John and Sabrina Garten, confirm that Officer Stone returned to the patrol car after placing Plaintiff inside, however, neither of them saw Officer Stone physically assault Plaintiff. (*See* John Garten Statement, Defs.' Mot., Ex. L; Sabrina Garten Statement, Defs.' Mot., Ex. L; *see also* Sullivan Statement, Defs.' Mot., Ex. L at 11 (stating that he did not see the officers strike Plaintiff once he was in the patrol car).)

Plaintiff was placed under arrest and transported to the Auburn Hills Police Department (AHPD) for processing. During an interview at the AHPD, Plaintiff stated on two separate occasions that Officer Stone "threw him against the windshield of their patrol car and had punched him 3 times ... for no reason." (Auburn Hills Police Department Follow-up Report, Defs.' Mot., Ex. B.)

As a result of his conduct, Plaintiff was charged with two criminal offenses: (1) unarmed robbery; and (2) resisting, obstructing, and assaulting a police officer. (Brady Dep., Defs.' Mot., Ex. A at 31; Tr. Plea Hr'g, Defs.' Mot., Ex. F at 5.) Plaintiff subsequently plead guilty to both offenses. (*Id.*)

### E. Federal Complaint

Approximately a year and a half later, on August 11, 2008, Plaintiff filed this suit. His three-count Complaint alleges: (1) violations of the Fourth and Fourteenth Amendment; (2) gross negligence; and (3) intentional infliction of emotional distress. [Docket Text #1.] The Court, on September 18, 2008, *sua sponte* dismissed Plaintiff's state-law claims. ([Docket Text #4] ("Since the parties to this matter are nondiverse, this Court declines to exercise supplemental jurisdiction over the [state-law] claims so as to avoid jury confusion").)

On November 3, 2009, after a number of extensions to the scheduling order and Plaintiff's retention of new counsel, Plaintiff filed a motion to dismiss his Complaint without prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2). [Docket Text # 34.] That motion was contested by Defendants and was referred to a magistrate judge for a report and recommendation. The magistrate judge recommended that—because "Plaintiff has offered no substantial justification for this court to abstain from the fulfillment of its duty to adjudicate the federal question presented in Count I of the Complaint"—the Court deny Plaintiff's motion. [Docket Text # 39.] This Court agreed and adopted the magistrate judge's report and recommendation. [Docket Text # 44.] A one-count Amended Complaint was subsequently filed on December 22, 2009. [Docket Text # 41.]

This matter comes before the Court on Defendants' amended motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56.

## II.  Rule 56 Motion for Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the

non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002)

## III. Analysis

Plaintiffs' one-count Amended Complaint alleges that—in executing his arrest on April 7, 2007—the City of Pontiac and, specifically, police officers Stone and Johnson used excessive force thereby violating his constitutional rights as secured by the Fourth and Fourteenth Amendments. Defendants moved for summary judgment on Plaintiff's constitutional claim.

The Court begins its analysis with an examination of the general legal principles governing Plaintiff's § 1983 claim, followed by an analysis of the constitutional violations alleged against each Defendant.

### A. 42 U.S.C. § 1983

Under 42 U.S.C. § 1983 civil liability is imposed on any person who, acting under color of state law, deprives another person of the "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under § 1983, the plaintiff must allege: (1) a deprivation of a right secured under the Constitution or federal law; and (2) that

a person acting under color of state law subjected him to the deprivation or caused him to be subjected to the alleged deprivation. *Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003) (citing *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996)).

"While government officials may be subject to § 1983 actions for violating an individual's constitutional right, a plaintiff must overcome the officials' qualified immunity in bringing such an action." *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 940-41 (6th Cir. 2004). This Court begins with a discussion of the doctrine of qualified immunity and how the Court determines whether a defendant is entitled to the protection afforded by that doctrine.

The doctrine of qualified immunity shields "government officials performing discretionary functions" from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (internal quotations and citations omitted). To determine whether qualified immunity is available, the Court conducts a three-step inquiry:

> First, [it] determine[s] whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[ ] show[s] that a constitutional violation has occurred. Second, [it] consider[s] whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, [it] determine[s] whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotations and citations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Although the Supreme Court, in *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 818 (2009), held that the courts now have discretion to address the second step first when appropriate, this Court will first examine whether Plaintiff has presented evidence of a constitutional violation. *See Grawey*, 567 F.3d at 309.

### B. Alleged Constitutional Violations[4]

───────────────────

[4] In any § 1983 action, the exact contours of the underlying right said to have been violated must first be identified. The Supreme Court has repeatedly held that where a particular constitutional Amendment "provides an explicit textual source of constitutional protection" against a particular government behavior, "that Amendment, not the more generalized notion of [fourteenth amendment] 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Insofar as Plaintiff's claim relates to Defendants' use of excessive force, it is properly analyzed under the Fourth Amendment, not under the Fourteenth Amendment. *See, e.g., Graham*, 490 U.S. at 395 (holding that "*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach") (emphasis in original); *Ewolski v. City of Brunswick*, 287 F.3d 492, 507 (6th Cir. 2002) (holding that because the plaintiff "was seized for the purposes of the Fourth Amendment, we therefore analyze the police's actions toward him solely under the objective reasonableness test of the Fourth Amendment").

Moreover, even if Plaintiff's claim did arise under the Fourteenth Amendment, the facts of this case do not rise to the level of a due process violation. The Supreme Court has held that, for purposes of a due process claim, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "In situations wherein the implicated state ... agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action ... their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). As discussed below, Plaintiff's Fourth Amendment rights were not violated. Accordingly, Defendants' actions could not have been taken with "deliberate indifference" towards those rights; therefore, Defendants' actions were not "conscience-shocking," and Plaintiff's Fourteenth Amendment claim fails.

Considering the facts in the light most favorable to Plaintiffs, this Court must determine whether a rational jury could find that Defendants' conduct violated Plaintiff's constitutional rights and, if so, whether Defendants' actions were objectively unreasonable.

### 1. Defendant City of Pontiac

A municipality may be held liable under § 1983 if the municipality itself caused a constitutional deprivation. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 (1978). A municipality, however, is not liable under § 1983 for an injury inflicted solely by employees or agents, as the doctrine of respondeat superior is inapplicable. *Id.* at 691-95. "It is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under § 1983." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (internal quotations and citations omitted). And, where the basis for asserting municipal liability is a policy or custom of tolerating violations of federal rights, a plaintiff must establish: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the municipality; (3) tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the custom was the "moving force" or direct causal link in the constitutional deprivation. *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

Here, Plaintiffs have failed to create a genuine issue of material fact with respect to municipal liability. Plaintiff has failed to provide any evidence of an unlawful municipal policy, practice or custom, much less one that could be the "moving force" behind the

alleged unconstitutional conduct of Officers Stone and Johnson.[5] The sole basis of Plaintiff's claim against the City of Pontiac are the allegations contained in his Amended Complaint.

> 29. That Defendant City of Pontiac has allowed Defendants Stone to continue employment notwithstanding his continued violations of citizens' constitutional rights including, but not limited to another incident during which he fired three pepper balls at a citizen in 2007.

---

[5] Plaintiff, in his response to Defendants' motion, argues that "Defendants took steps to conceal ... information in order to shield their officers from liability. It is that active concealment of abusive police actions that creates the liability of the city of Pontiac." (Pl.'s Resp. at 1.) The record, however, contains no evidence of any concealment. The internal affairs office of the PPD, in fact, investigated Plaintiff's claims of abuse and conducted six separate interviews into the events surrounding Plaintiff's arrest on April 7, 2007. (*See* Defs.' Mot., Ex. D ("This meeting that you're having and this investigation we're having is in reference to an internal investigation with the Pontiac Police Department [regarding the complaint Plaintiff filed with the PPD on April 9, 2007]."); *see also* Defs.' Mot., Exs. E, L.)

Moreover, Plaintiff's claim that the PPD may have attempted to conceal the fact that Sergeant Harris observed "what appeared to be a piece of tooth on the windshield" of Officer Stone's patrol car is simply not supported by the record. Defendants have not contested that, during his arrest, Plaintiff contacted the patrol car nor have Defendants' contested that the windshield was damaged as a result of that contact. Additionally, Defendants have not contested that a piece of Plaintiff's tooth was observed on the patrol car's windshield. Defendants have merely theorized that Plaintiff's tooth may have been injured prior to his encounter with the police—that the "violent" crash during the high speed police chase, instead, may have caused the injury to Plaintiff's tooth. And, although this Court is granting Defendants' motion on other grounds, it recognizes that Defendants' theory here is not only plausible, but is also supported by the record. The transcript of Plaintiff's interview with the PPD Internal Affairs Office provides:

> Terry: ... You were in the vehicle that hit somebody but that you don't know ... what shape they're in.
> Brady: I was a passenger. That do not concern me ... I wasn't driving. ... Well I was more concerned about myself. ...
>
> Terry: What were you worried about?
> Brady: Well I was just making sure wasn't no; I didn't have no teeth missing or ... That I was like ... I was making sure that I had all my teeth in ...

(Defs.' Mot., Ex. D at 10, 12.)

30. Defendant Stone's actions which have been tolerated by Defendant City of Pontiac show that the municipality has either failed to properly train him or has acquiesced to his illegal actions by continuing his employment.

31. The city's indifference to Officer Stone's violations of citizens rights evinces a deliberate indifference to the rights of citizens who come into contact with the police.

32. Defendant City of Pontiac, acting under color of state law, authorized, tolerated, ratified, permitted, or acquiesced in the creation of practices and customs establishing a de facto policy of deliberate indifference to the constitutional rights of individuals such as Plaintiff.

(Am. Compl. ¶¶ 29-32.) Despite these vague and conclusory allegations contained in the Amended Complaint, Plaintiff has not provided any factual support for the claimed constitutional violation against the City of Pontiac. Plaintiff's bare allegations here are not sufficient. *See Taylor v. Canton, Ohio Police Dept.*, 544 F.Supp. 783, 788 (N.D. Ohio 1982) (holding that a plaintiff must set forth facts showing the existence of an offending custom or policy and mere conclusory allegations are insufficient).

Under Rule 56, the party opposing a motion for summary judgment "may not rely merely on allegations ... in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. If the disputed evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). Plaintiff has not met this standard, and the Court finds that Plaintiff has failed to present sufficient evidence such that a reasonable juror could find that the City of Pontiac had a policy, custom or practice

of tolerating constitutional violations. Accordingly, the City of Pontiac is entitled to summary judgment in its favor.

### 2. Defendant John Johnson

In response to Defendants' motion, Plaintiff asserts two basis of liability against Officer Johnson: (1) failure to prevent Officer Stone from committing constitutional violations against Plaintiff; and (2) committing a constitutional violation himself by using excessive force in escorting Plaintiff to the patrol car. The Court addresses each allegation in turn.

### a. Failure to Prevent Constitutional Violation

The Amended Complaint does not allege any affirmative act on Officer Johnson's part against Plaintiff. Plaintiff only alleges that Officer Johnson's failure to act permitted excessive force to be used against him.

> 27. That Defendant John Johnson breached his absolute duty and violated Plaintiff's constitutional rights as protected by the 4th and 14th amendment by failing to stop Defendant Stone from using excessive and unwarranted force after Plaintiff was fully and completely under Defendants officers' control.

> 28. Defendant Johnson aided his partner by explicitly or impliedly allowing him to slam Plaintiff's head unto the windshield of a car and beat Plaintiff. ...

(Am. Compl. ¶¶ 27-28.) Plaintiff claims that Officer Johnson stood by during Officer Stone's contact with him, without attempting to intervene.

Generally a police officer is only liable for § 1983 claims where he actually participated in some unconstitutional conduct. An officer who does not actively participate in the use of excessive force may nevertheless be held liable if the plaintiff can prove that the non-participant "owed the victim a duty of protection against the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). This can be shown where "the [non-

participating] officer observed or had reason to know that excessive force would be or was being used, and the officer had both the opportunity and the means to prevent the harm from occurring." *Id.*

It is not disputed that—after escorting Plaintiff to the patrol car—Officer Johnson left to attend to other matters, did not have any further contact with Plaintiff, and was not around when the alleged constitutional violations occurred. There is also no evidence that Officer Johnson observed or had reason to know that any of the alleged unconstitutional acts were about to occur or that he was in position to prevent them from occurring. To the contrary, the record reveals that such conduct was not anticipated or expected: Plaintiff's testimony and the video footage demonstrate that the arrest happened quickly. Further, there is no evidence that Officer Johnson had either the opportunity or the means to prevent the alleged harm form occurring, and Plaintiff's bare allegations are insufficient to establish such. Accordingly, a reasonable jury could not find that Officer Johnson knew or should have known what Officer Stone would do or that Officer Johnson had the opportunity to prevent these acts from occurring. Officer Johnson is, therefore, not liable for the alleged force used by Officer Stone. Absent other evidence of unconstitutional conduct on his part, Officer Johnson is entitled to summary judgment in its favor.

### b. Force Used by Johnson Objectively Reasonable

In his response to Defendants' motion Plaintiff includes an allegation of affirmative unconstitutional conduct against Officer Johnson. The response claims that both Officer Johnson and Officer Stone used excessive force while escorting him to the patrol car. (Pl.'s Resp. at 7 (claiming that Officer Johnson "took control of Plaintiff who was compliantly on the ground at the time of the officers' arrival at the scene. Defendants Stone and Johnson

lifted Plaintiff with abrupt force and in such manner as to place unnecessary pressure on his shoulders and pain upon his body. The officers elected not to handcuff Plaintiff prior to taking him to their car. Then they dragged him to the car").)

The right to be free from the use of excessive or unreasonable force is a clearly established constitutional right. *See Graham v. Connor*, 490 U.S. 386, 392-99 (1989). "The 'reasonableness' inquiry in an excessive force case is an objective one; consequently, [the Court] must consider 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Ingram v. City of Columbus*, 185 F.3d 579, 596 (6th Cir. 1999) (quoting *Graham*, 490 U.S. at 397). Determining whether there has been a constitutional violation is fact-specific, is analyzed under a totality of the circumstances test, and requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotations and citation omitted). As observed by the Sixth Circuit:

> Under *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.

18

What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 346 (1992).

Taking the evidence in the light most favorable to Plaintiff but viewing it from the perspective of a reasonable officer on the scene, Plaintiff's evidence does not establish an excessive force claim against Officer Johnson. The record, and the video footage, simply does not reveal that the force deployed by Officer Johnson was excessive or otherwise unconstitutional. The evidence merely reflects that Officers Stone and Johnson escorted Plaintiff to the patrol car and Plaintiff resisted their exercise of control over him. Not only did Plaintiff resist, obstruct, and assault a police officer—an offense to which he plead guilty to[6]—but a number of witness stated that as he was being escorted to the patrol car he pulled back, struggled, and protested his innocence. The record, here, is simply devoid of any evidence that the physical force deployed by Officer Johnson, or Officer Stone, in escorting Plaintiff to the patrol car was anything other than objectively reasonable. Accordingly, Officer Johnson is entitled to summary judgment in its favor.

### 3. Defendant David Stone

Plaintiff alleges that Officer Stone violated his constitutional rights by: (1) slamming his head into the patrol car windshield; (2) punching him repeatedly; and (3) assaulting him

---

[6] Plaintiff is precluded by law from denying active resistence. *See Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988) (holding that a plea of no contest in a state-court criminal proceeding precludes that defendant, under the doctrine of collateral estoppel, from re-litigating the factual basis for the underlying criminal conviction in a subsequent civil action brought in federal court under 42 U.S.C. § 1983). Thus, Plaintiff cannot now assert that he did not resist the officers' efforts to arrest him.

inside the patrol car. As discussed below, this Court finds that Plaintiff's excessive force claims against Officer Stone also fail.

### a. Fed. R. Civ. P. 36(b)

On August 25, 2009, Defendants served Plaintiff with requests for admissions. (Defs.' Reply, Ex. N.) Although the requests for admission were addressed to "Demetrius Brady, In Pro Per, 360 Central St., Pontiac, MI", the attached proof of service demonstrates that, pursuant to Fed. R. Civ. P. 5(b)(2)(c), Defendants served Plaintiff with the requests for admission via regular first class mail at two separate address that, during the pendency of this action, Plaintiff claimed to reside: 360 Central St., Pontiac, Michigan and 91 Palmer, Pontiac, Michigan. (Defs.' Reply, Ex. N at 8; Defs.' Supp. Brief Ex. 1 at 8.) "Because there was a discrepancy regarding Plaintiff's last known address, Defendants used an abundance of caution and served the Requests for Admission of Plaintiff by mailing the document to both of the addresses which Plaintiff informed Defendants had been at one time or another his 'current address.'" (Defs.' Supp. Brief at 4.) Plaintiff, however, contends that he never received the requests for admission.

> At a hearing on December 01, 2009, ... Plaintiff ... testified that his address is 91 Palmer. ... [It] is a real cause of concern as to whether any document was ever mailed to Plaintiff. The 360 Central address is Plaintiff's parent's house and if any document was sent to that location, Plaintiff would have received knowledge of it. The fact that he did not receive anything is sufficient for the court to rule that there is no duty to respond to something that one did not receive. And since there was no document received at either address, Plaintiff has no duty to respond to what he did not receive.

(Pl.'s Supp. Brief at 3-5.)[7] The fact that Plaintiff claims that he did not receive the requests for admission is irrelevant: under Fed. R. Civ. P. 5(b)(2)(c) the mailing of the requests for admission to Plaintiff's last known address constituted service upon him and nonreceipt does not affect its validity.[8]

---

[7] Plaintiff's counsel arguably misrepresented to this Court—both orally (at the July 7, 2010 hearing on Defendants' motion for summary judgment) and in writing (in his supplemental brief, Docket Text #69)—that, on December 1, 2009, Plaintiff testified under oath that he never received the requests to admit. (*See, e.g.*, Pl.s' Supp. Brief at 2 ("[A]fter Plaintiff's testimony that he did not receive any Request to Admit ..."); *see also id.* at 4 ("At the same hearing, Plaintiff testified and stated that he did not receive anything ..."); *id.* at 5 ("Plaintiff testified under oath that he did not receive anything.").) The transcript of Plaintiff's testimony, however, does not include any such affirmative statement by Plaintiff. The relevant portion of the transcript provides:

> Court: Anything further that you think I should know to help me?
> Plaintiff: Yes, your Honor. I think that you should know that my mailing address is 91 Palmer, Pontiac, Michigan, 48341, not 360 Central, Pontiac, Michigan.
> Court: Was that the–the address that the certificate of service was sent to, the requests for admissions? Are you telling me that you did not live at the address to which–
> Plaintiff: I don't live at the address of 360 Central. I live at 91 Palmer Street.
> Court: Did you, at some point, live at 360–360 Central?
> Plaintiff: That's my–that's my parents' house. I reside with my grandmother.
> Court: Thank you very much.

(Tr. of Dec. 1, 2009 Hr'g on Pl.'s Motion to Dismiss Without Prejudice at 31.) While this transcript shows that Plaintiff made statements regarding his current address, it does not show that Plaintiff made any affirmative statement that he, in fact, never received the requests for admission.

[8] *See Carter v. McGowan*, 524 F.Supp. 1119, 1121 (D.C. Nev.1981) ("The plaintiff's claim that he never received notice of the taking of his deposition is not disputed. However, mailing of the notice to him at his last known address constituted service upon him. Fed. R. Civ. P. 5(b). Nonreceipt of the notice does not affect its validity.") (citing 2 Moore's Fed. Prac. § 5.07, 4 Wright & Miller, Fed. Prac. and Proc. § 1148); *Greenspun v. Schlindwein*, 574 F.Supp. 1038, 1039 (E.D. Pa. 1983) ("[B]ecause service by mail is complete upon mailing, Fed. R. Civ. P. 5(b), plaintiff's denial that he received the government's responsive pleading is irrelevant."); *Korte v. Chico Unified School Dist.*, No. 85-739, 1988 WL 168521, *2 (E.D. Cal. Oct 14, 1988) ("The plaintiff's claim that he never received notice of the taking of his deposition is not disputed. However, mailing of the notice to him at his last known address constituted service upon him. Fed. R. Civ. P. 5(b). Nonreceipt of the notice does

Federal Rule of Civil Procedure 36(a)(1) permits a party to "serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matter within the scope of Rule 26(b)(1) relating to ... facts, the application of law to fact, or opinions." Subsection (a)(3) provides that a party has 30 days in which to respond to a Request for Admission and if a party does not serve an answer or objection within the time specified, the matter requested is "deemed admitted."

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

Fed. R. Civ. P. 36(a)(3).

Federal Rule of Civil Procedure 36(b) further provides that "a matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). "Rule 36(a) allows a party to request an admission even where the request seeks admission of 'ultimate facts' or 'is dispositive of the entire case.'" *Turk v. Citimortgage*, No. 05-70386, 2005 WL 2090888, at *3 (E.D. Mich. 2005) (citing *Campbell v. Spectrum Automation Co.*, 601 F.2d 246, 253 (6th Cir. 1979)). "Thus matters deemed admitted can serve as a basis for the granting of a motion for summary judgment." *Id.* (citing Fed. R. Civ. P. 56(c); *First Nat'l Bank Co. of Clinton, Ill. v. Ins. Co. of N. Am.*, 606 F.2d 760, 766 (7th Cir. 1979); *Dukes v. South Carolina Ins. Co.*, 770 F.2d 545, 548-49 (5th Cir. 1985)).

---

not affect its validity.").

Here, Defendants served Plaintiff with requests for admissions on August 25, 2009. The requests for admission asked Plaintiff to admit, *inter alia*, each of the following:

> 7. Please admit that Officer Stone did not force your face into the windshield of the police vehicle during your arrest on ... April 7, 2007. ...

> 9. Please admit that Officer Stone did not punch or strike you in the face during your arrest ...

> 11. Please admit that Officer Stone did not force your head into the divider located between seats in the Pontiac Police vehicle ...

> 19. Please admit that as a result of the automobile accident ... you sustained physical injuries including injury to your teeth, gums, and jaw.

(Defs.' Reply, Ex. N.) Plaintiff has never responded. In a pleading dated November 13, 2009, (Defs.' Resp. to Pl.'s Mot. to Dismiss at 8 [Docket Text # 36]), Defendants reminded Plaintiff again of the outstanding requests for admissions. Despite notice, Plaintiff has not responded to Defendants' requests for admissions nor has Plaintiff moved this Court for an order extending the time to respond. As Plaintiff has failed to answer or object to Defendants' requests for admission, the Court will deem the matters within the requests admitted pursuant to Rule 36.[9] Plaintiff is, thus, estopped from arguing that Officer Stone engaged in acts of excessive force resulting in an injury or that his injury occurred by any other means other than the automobile accident. *See, e.g., Jones v. City of Flint*, 07-10524,

---

[9] In his supplemental brief, Plaintiff moved to withdraw the admissions under Fed. R. Civ. P. 36(b). Under Rule 36(b) "the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." The Court declines to exercise its discretion to permit withdrawal of the admissions. Moreover, the Court finds that Plaintiff's motion fails to satisfy the rule's requirements. *See, e.g., Heller Financial, Inc. v. Pandhi*, 1989 WL 136091, *4 (6th Cir. 1989).

2009 WL 174136, *2 (E.D. Mich. Jan 26, 2009). Officers Stone is, therefore, entitled to summary judgment.

Notwithstanding the procedural bar to Plaintiff's claims, this Court also finds that Plaintiff's excessive force claims against Officer Stone fail on substantive grounds. The Court first addresses the claim of excessive force related to Plaintiff's contact with the windshield followed by his claim of excessive force related to the subsequent punches and the alleged assault while in the patrol car.

### b. Windshield Incident: Force Used by Stone Objectively Reasonable

In response to Defendants' motion, Plaintiff alleges that Officer Stone, after having him under "complete and total control"

> took Plaintiff's head and with extreme and brute force slammed Plaintiff's face into the windshield of Defendants' patrol car. ... Plaintiff's face was slammed into the windshield with such force that the windshield of the patrol car shattered. After his face was slammed into the windshield, Plaintiff's teeth came out and one of his teeth became embedded in the patrol's car windshield.

(Pl.'s Resp. at 7-8.) Plaintiff's claims:

> 24. That the force used by Defendant Stone against Plaintiff was extreme, grossly excessive, unreasonable, unwarranted and done for the sole purpose of inflicting pain and suffering upon Plaintiff.
>
> 25. That by slamming Plaintiff's head unto the windshield of a patrol car, Defendant Stone who was acting under color of his authority as police officer clearly engaged in unwarranted violence against a young, frail man over whom he had complete control and who did not pose any threat to him. ...

(Am. Compl. ¶¶ 24-25.)

Taking the evidence in the light most favorable to Plaintiff but viewing it from the perspective of a reasonable officer on the scene—the Court finds that, with regards to the incident where Plaintiff contacted the windshield of the patrol car, Plaintiff's has not

established an excessive force claim against Officer Stone. As discussed above, determining whether there has been a constitutional violation is fact-specific, is analyzed under a totality of the circumstances test, and requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The record, here, is simply devoid of any evidence that the physical force deployed by Officer Stone was anything other than objectively reasonable. Plaintiff was involved in an unarmed robbery of an unsuspecting victim, he fled the scene of the crime, entered into a high speed police chase that ended in a violent collision with another unsuspecting victim. Plaintiff then continued to flee on foot and refused lawful orders to surrender. When finally detained by a group of citizens, and then by police, Plaintiff resisted the efforts to detain and arrest him. Officer Stone's efforts to control Plaintiff while effectuating a lawful arrest, under the circumstances presented here, were objectively reasonable.[10]

---

[10] Although the Court did not consider the opinions of the witnesses to the events of April 7, 2007 in determining whether a constitutional violation had occurred, it is interesting to note that the predominant response from those witnesses was that the officers acted reasonable under the circumstances. In their interview with the PDP, Kaller and Smith were asked the following question "From what both of you seen out there on this incident do you fell that the Pontiac police ... officers that were there did anything that was excessive, did nay type of excessive force to [Plaintiff] or did they go above the means of arresting him? Do you feel that they acted appropriately for what they had to deal with?" that "the officers ... they were struggling with [Plaintiff]." Williams responded: "Yeah I think they did." (Williams Statement, Defs.' Mot., Ex. L at 12). Kaller similarly responded: "I think they acted appropriately too." (Kaller Statement, Defs.' Mot., Ex. L at 12). Like Kaller and Smith, Sullivan, in his interview, was asked "So in your opinion ... the officers the way they handled themselves due to the fact that ... [Plaintiff] was actively resisting during the incident, you believe that the officers handled the situation appropriately?", and responded "Yeah I believe if he wouldn't have freaking kept jerking around and acting like a fool they may not have done what they did." (Sullivan Statement, Defs.' Mot., Ex. L at 14.)

### c. Allegations of Other Abuse: Blatantly Contradicted by the Record

In response to Defendants' motion, Plaintiff also alleges that Officer Stone, following the windshield incident,

> repeatedly punched Plaintiff on or about his head and face before placing Plaintiff in the patrol car and they continued hitting him after placing him in the rear of the patrol car.

(Pl.'s Resp. at 8.) Plaintiff thus claims:

> 24. That the force used by Defendant Stone against Plaintiff was extreme, grossly excessive, unreasonable, unwarranted and done for the sole purpose of inflicting pain and suffering upon Plaintiff.

(Am. Compl. ¶ 24.) Despite these vague and conclusory allegations, Plaintiff has not provided sufficient factual support for the claimed constitutional violation against Officer Stone regarding the alleged punches or assault while in the patrol car.

Under Rule 56, the party opposing a motion for summary judgment "may not rely merely on allegations ... in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. If the disputed evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See also Scott v. Harris*, 550 U.S. 372, 380 (2007).

That is the case here with regard to the issue of whether Officer Stone punched

Plaintiff in the face and whether Officer Stone assaulted Plaintiff while in the patrol car.

> [Plaintiff] claims that immediately after his face struck the windshield, the officer lifted him up and punched him repeatedly. [Plaintiff] contends that the officer walked him to the opposite side of the vehicle and punched him again. [Plaintiff] contents that the officer placed him the rear of the vehicle, grabbed the back of his head and forced his head forward into the center divider. [Plaintiff] cannot recall how many times he was punched or where the punches landed. However, he admits that the alleged beating took place in front of a group of concerned citizens. [Plaintiff] did not advise any of the treating, assisting or attending physicians that he was punched by a police officer. The civilian witnesses interviewed by police advised investigators that [Plaintiff] struggled with the officers throughout. However, not one of the witnesses saw any police officer strike Plaintiff with an open or closed hand.

> [Plaintiff]'s testimony regarding this occurrence is directly contradicted by the videotape evidence and [Plaintiff]'s admissions to police investigators and medical providers. [Plaintiff]'s testimony is inherently unbelievable, contrary to the record and insufficient as a matter of law to support a cause of action for excessive force under the Fourth Amendment.

(Defs.' Mot. at 29 (internal citations omitted).) The Court agrees: Plaintiff's "version of

events is so utterly discredited by the record that no reasonable jury could have believed

him." *Scott*, 550 U.S. at 380. Accordingly, Officer Stone is entitled to summary judgment

in his favor.

## IV. Conclusion

For the foregoing reasons, Defendants' amended motion for summary judgment is

hereby GRANTED.[11]

---

[11] For the reasons stated above and finding the arguments in Defendants' brief well-founded, Defendants' motion to dismiss consolidated case 10-12088 [Docket Text #57] is also GRANTED.

Because Plaintiff has failed to demonstrate excusable neglect that would permit the Court, in its discretion, to further extend the discovery deadline under Fed. R. Civ. P. 6(b)(1)(B), Plaintiff's motion to extend the scheduling order [Docket Text #60] is DENIED.

Plaintiff's motion in limine [Docket Text #59] is DENIED as moot.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: July 21, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 21, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager